IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
DANVILLE DIVISION

| | |
|---|---|
| ELIZABETH ANN EL KASSEMY | ) |
| | ) |
|     **Plaintiff,** | ) |
| | ) |
| | ) |
| **v.** | ) |
| | )   **Civil Action No. 4:08CV00018** |
| | ) |
| TELVISTA, INC., | ) |
| | ) |
|     **Defendant.** | ) |

**DEFENDANT'S MEMORANDUM IN SUPPORT OF ITS MOTION FOR
SUMMARY JUDGMENT**

Defendant, Telvista, Inc. ("Telvista" or "Company"), by counsel, files the following

Memorandum in Support of its Motion for Summary Judgment.

**STATEMENT OF THE CASE**

Plaintiff, Elizabeth Ann El Kassemy ("El Kassemy"), filed a *pro se* lawsuit on or about

June 2, 2008. Like many such lawsuits, it is hard to decipher exactly what El Kassemy is

alleging to be discriminatory. However, the Complaint does point to a right-to-sue notice El

Kassemy received from the Equal Employment Opportunity Commission ("EEOC") and the

right-to-sue notice is attached to the Complaint. (*See* Complaint, Docket # 3, Answer to question

C and Document 3-2 attached to Complaint.) That right-to-sue notice is for EEOC charge

number 438-2006-00779 (the "00779 charge"). (*Id.*)

Because it is well-settled that the EEOC charge defines the scope of what may be

litigated in a subsequent civil action,[1] the allegations contained in the 000779 charge provide the

---

[1] *See, e.g., Evans v. Technologies Applications and Serv. Co.*, 80 F.3d 954, 962-63 (4th Cir. 1996).
{#1147259-1, 108258-00003-02}

framework for El Kassemy's present Complaint.  A copy of the 000779 charge is attached to the Appendix hereto as Exhibit A.

A review of the 000779 charge shows that El Kassemy is complaining of the following: (a) harassment for race discrimination, Black, in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. §§ 2000(e) *et. seq.*, because she was allegedly closely scrutinized in her performance, because she allegedly engaged in discussion in the workplace about her complaint to the EEOC, and because she allegedly complained about rumors regarding her husband and an affair; (b) harassment for age discrimination, in violation of the Age Discrimination in Employment Act of 1967 ("ADEA"), 29 U.S.C. §§ 621 *et. seq.*, for the same reasons as set forth under (a) above; and (c) retaliatory discharge on August 20, 2006 because she allegedly complained six months earlier, in February, 2006, that Telvista had disclosed her confidential medical information to her husband in violation of Section 503 of the Americans with Disabilities Act of 1990 ("ADA"), 42 U.S.C. §§ 12101 *et. seq.*

## STATEMENT OF THE UNDISPUTED FACTS

### A.    GENERAL.[2]

Telvista is a company which specializes in providing innovative, high-quality outsourced customer care solutions to a broad range of mid-size and Fortune 1000 clients.  (Affidavit of Ronald J. Lisenby, ¶ 2, attached to the Appendix hereto as Exhibit C (hereinafter "Lisenby Aff.").)  These solutions include outsourced contact center services and related hosted applications, such as contact management, interactive voice response, and Web-based support.

WOODS ROGERS PLC
ATTORNEYS AT LAW

---

[2] Telvista propounded Interrogatories and Requests for Product of Documents to El Kassemy on October 13, 2008.  A copy of the discovery is attached to the Appendix hereto as Exhibit B.  El Kassemy has not responded to the discovery.

(*Id.*) Telvista has several call centers to service its clients, including one in Danville, Virginia. (*Id.*)

Telvista is a private employer and not a government contractor. (*Id.* at ¶ 3.) Telvista does not have contracts in excess of $10,000 entered into with the federal government. (*Id.*) Telvista, however, is an Equal Employment Opportunity Employer which does not tolerate any discrimination/harassment in any term or condition of employment. (*Id.* at ¶ 4.) These policies can be found in Telvista's handbook called the "Team Member Guide." (*Id.* and Exhibit 1 attached to Lisenby's Affidavit.) El Kassemy should have been aware of these polices because she acknowledged receipt of the Team Member Guide and agreed to review the policies and procedures contained therein. (*Id.* at ¶ 5 and Exhibit 2 attached to Lisenby's Affidavit.)

In 2006, the year El Kassemy was terminated from Telvista, Telvista reported that it employed 526 employees at its Danville Call Center. (*Id.* at ¶ 6 and Exhibit 3 attached to Lisenby's Affidavit.) Of the 526 employees, 368, or approximately 70%, were Black. (*Id.*)

### B.   EL KASSEMY'S EMPLOYMENT.

El Kassemy was hired by Telvista's Danville Call Center to be a customer service representative in April, 2005. (*See* Exhibit A to the Appendix attached hereto.) Her birth date is May 23, 1964, and as a result, she was 40 at the time of hire. (*Id.*)

As set forth in greater detail below, El Kassemy, throughout most of her employment, complained to management concerning a variety of issues. (Lisenby Aff. at ¶ 7.) Often times, the way she complained was insubordinate and rude. (*Id.*) Notwithstanding this, Telvista investigated each of these complaints and ultimately found that they did not have merit. (*Id.*) Not happy with the response, El Kassemy continued to make the same complaints internally over and over again which caused a great deal of frustration and loss of productivity at Telvista. (*Id.*)

WOODS ROGERS PLC
ATTORNEYS AT LAW

3

The first of the complaints occurred in November of 2005 and was directed against another employee, Alicia Leigh ("Leigh"), who is also Black. (*Id.* at ¶ 8; *see also* Exhibit A to the Appendix attached hereto.) Leigh worked for Telvista as an Administrative Assistant in the Human Resources Department at the Danville Call Center. (*Id.*) Leigh, however, had no supervisory authority over El Kassemy and she did not have the authority to discipline or terminate El Kassemy. (*Id.*)

According to El Kassemy, Leigh had allegedly told other employees that she (Leigh) had an affair with El Kassemy's husband. (*Id.* at ¶ 9.) El Kassemy thought this was harassment, and consequently, Telvista's Human Resources Manager in Danville, Ronald Lisenby ("Lisenby"), conducted an investigation as to El Kassemy's claims. (*Id.*)

During the investigation, El Kassemy refused to provide Lisenby any specifics as to how or when Leigh had allegedly harassed El Kassemy. (*Id.* at ¶ 10.) Notwithstanding this, Lisenby interviewed Leigh and other people who Lisenby thought were potential witnesses. (*Id.*) Lisenby could not verify from any witness he interviewed that they had heard Leigh make any claims about an affair with El Kassemy's husband, or that they had seen any inappropriate behavior between Leigh and El Kassemy. (*Id.*) When Lisenby interviewed Leigh, Leigh denied: (a) that she had made any statement to anyone to the effect that she was having an affair with El Kassemy's husband, (b) that she had ever had, or was having, an affair with El Kassemy's husband, or (c) that she had done anything else which would be considered inappropriate. (*Id.* at ¶ 11.)

Lisenby did learn from Leigh, however, that Leigh had recognized El Kassemy's husband when he had come into the Danville Call Center once with El Kassemy. (*Id.* at ¶ 12.) Leigh only knew El Kassemy's husband superficially because he used to be Leigh's pizza delivery

WOODS ROGERS PLC
ATTORNEYS AT LAW

man. (*Id.*)  Apparently, upon recognizing El Kassemy's husband, Leigh had mentioned this to another employee. (*Id.*)  Although he did not need to do so as there was no evidence of inappropriate behavior, Lisenby nevertheless warned Leigh that she should not have mentioned the fact that she knew El Kassemy's husband to another co-employee in order to try to diffuse the situation. (*Id.* at ¶ 13 and Exhibit 4 attached to Lisenby's Affidavit.)

On November 30, 2005, Lisenby met with El Kassemy to discuss the results of his investigation. (*Id.* at ¶ 14.)  He told El Kassemy that he had found no evidence to support her allegations of harassment or inappropriate conduct. (*Id.*)  He also advised El Kassemy, however, that: (a) he was willing to help El Kassemy with any future problem going forward and that she should not hesitate to contact him if she had such problems, and (b) that El Kassemy should not be worried about Leigh as far as Leigh being able to effect El Kassemy's employment because Leigh was a co-worker—not El Kassemy's supervisor— and thus had no authority to discipline or terminate El Kassemy. (*Id.* and Exhibit 5 attached to Lisenby's Affidavit.)

After the November 30, 2005 discussion with El Kassemy, Lisenby thought that this matter was resolved. (*Id.* at ¶ 15.)  Unfortunately, Lisenby was mistaken.  On or about January 31, 2006, El Kassemy made the same allegation against Leigh as she had done before—*e.g.*, that Leigh was allegedly talking to others about her (Leigh) having an affair with El Kassemy's husband and that Leigh was harassing El Kassemy without providing any corroborative evidence to substantiate what the harassment was. (*Id.*)  Lisenby again investigated and once more could not verify the substance of El Kassemy's allegations. (*Id.*)

Thereafter, El Kassemy brought this same complaint to Telvista's corporate Human Resources Group Manager, Jana Vigil ("Vigil"). (*Id.* at ¶ 16.)  Vigil reviewed the investigation and also concluded that there was no basis to El Kassemy's complaint. (*Id.*)  On or about

WOODS ROGERS PLC
ATTORNEYS AT LAW

5

February 23, 2006, Vigil and Lisenby talked to El Kassemy and advised her of the company's findings that an allegation of harassment/discrimination could not be substantiated. (*Id.* at ¶ 17.) They also told El Kassemy that the decision was final and that there was no more in-house review available, and thus, to drop the issue internally. (*Id.*) At no time, however, did Telvista tell El Kassemy that she could not proceed externally with her complaint, such as with the EEOC. (*Id.*)

Not being one to listen, El Kassemy proceeded in the next two months to verbally and through the company e-mail system voice the same complaint to various other employees at Telvista. (*Id.* at ¶ 18.) This caused great distraction and productivity loss for Telvista. (*Id.*) Additionally, Telvista's anti-harassment/discrimination policy (found in the Team Member Guide) requires that such a complaint be made in good faith, and El Kassemy's repeated complaint against Leigh, without El Kassemy giving any specifics as to how or when Leigh had allegedly harassed El Kassemy, violated the good faith requirement mentioned above. (*Id.* and Exhibit 1 attached to Lisenby's Affidavit.) Consequently, on May 5, 2006, Telvista warned El Kassemy in writing to stop her disruptive behavior. (*Id.* and Exhibit 6 attached to Lisenby's Affidavit.)

El Kassemy's close to paranoid behavior did not stop with her allegations regarding Leigh. During her employment, she also continually made allegations that she was under heavy surveillance. (*Id.* at ¶ 19.) The allegation arose out of El Kassemy's belief that she kept hearing a buzzing noise from the telephone headset she used. (*Id.*) Because Telvista is in the call-center business, employees know that their phone calls in assisting Telvista's client's customers could and would be monitored for, among other things, quality assurance purposes. (*Id.*) In fact, the Team Member Guide specifically notifies employees that they "have no right to privacy in

connection with the transmission, receipt or storage of information using Telvista telephones." (*Id.* and Exhibit 7 attached to Lisenby's Affidavit.)

Starting in April of 2006, El Kassemy sent several e-mails to several different management employees about her belief that she was being monitored excessively and that this was a form of harassment. (*Id.* at ¶ 20 and Exhibit 8(a) through 8(f) attached to Lisenby's Affidavit.) The tone of several of these e-mails were threatening at worst and insubordinate at best. (*Id.* at 21 and Exhibit 8(a) through 8(f) attached to Lisenby's Affidavit.) Rather than firing El Kassemy for her tone, which was in violation of company policies, Telvista, however, did what it always did—it investigated El Kassemy's allegations. (*Id.* at ¶¶ 21-22 and Exhibit 9 attached to Lisenby's Affidavit. )

Thus, sometime in July, Lisenby asked one of his subordinates to check the call logs on monitoring for a five week period from June to July. (*Id.* at ¶¶ 22-24 and Exhibit 10 (a) through 10(e) attached to Lisenby's Affidavit.) Not surprisingly, the investigation revealed that El Kassemy, over that five week, period was being treated like anyone else and that she was not being subject to excessive monitoring. (*Id.*) Based on these results and the ever increasing hostile and persistent nature of El Kassemy's e-mails regarding monitoring, Telvista again warned El Kassemy regarding her conduct. (*Id* .) That written warning was provided to El Kassemy in early August, 2006. (*Id.* and Exhibit 11 attached to Lisenby's Affidavit.)

In addition to El Kassemy claiming that she was being monitored extensively, she also alleged through most of 2006 that Leigh was tampering with her time-off requests. (*Id.* at ¶¶ 25-26 and Exhibit 12 (a) through 12(e) attached to Lisenby's Affidavit.) Lisenby and others investigated these allegations and found no merit to them. (*Id.*) First, Leigh had no authority to approve or deny El Kassemy's time-off requests. (*Id.*) Second, on several occasions, El

WOODS ROGERS PLC
ATTORNEYS AT LAW

7

Kassemy was not allowed time-off because she did not go through the proper channels even though she had been advised what those channels were on several occasions. (*Id.*) Finally, there were several instances where Telvista could not approve the time-off request because of scheduling issues—*i.e.*, others had already requested time-off, etc. (*Id.*) Notwithstanding this, almost every time El Kassemy was denied a request for time-off, she would claim that there was some sort of conspiracy—much to the frustration of Telvista management who had to constantly deal with her tirades. (*Id.*)

### C.   THE TERMINATION OF EL KASSEMY'S EMPLOYMENT.

In late July, 2006, El Kassemy sent two e-mails to Leigh again accusing Leigh, of among other things, spreading rumors and tampering with her time-off requests. (*Id.* at ¶ 27 and Exhibit 13 (a) through 13(b) attached to Lisenby's Affidavit .) These e-mails also alleged that Leigh was calling El Kassemy on her cell and home phone and sending e-mail messages to her house. (*Id.*)

Leigh, fed up with the constant accusations, filed a complaint against El Kassemy claiming that the e-mails were threatening. (*Id.* at ¶ 28.) As a result of Leigh's complaint, Lisenby went to both El Kassemy and Leigh to investigate the allegations. (*Id.*) Leigh denied that she had sent the e-mails to El Kassemy's home, called El Kassemy at home or on her cell phone, tampered with her benefits, or spread any rumors about El Kassemy. (*Id.* at ¶ 29.)

At this point, Lisenby went to El Kassemy to see what evidence she had to justify the accusations made in the e-mails she had sent to Leigh. (*Id.* at ¶ 30.) El Kassemy, however, once again failed to cooperate in the investigation. (*Id.*) In fact, she would, or could, not produce any records to show that Leigh had acted in the manner that El Kassemy had alleged in those e-mails. (*Id.*) For example, El Kassemy did not have any e-mail or telephone records to show that Leigh had called El Kassemy on her cell phone or home or sent e-mails to her house. (*Id.*)

WOODS ROGERS PLC
ATTORNEYS AT LAW

8

Lisenby was concerned by El Kassemy's behavior because he thought that if these issues had occurred as El Kassemy had alleged, a reasonable person would have saved those messages or e-mails to verify the offensive conduct. (*Id.* at ¶ 31.) The fact that El Kassemy did not have such evidence, nor did she want to cooperate in the investigation, lead Lisenby to reasonably conclude that El Kassemy was not being truthful and that her allegations in the e-mails to Leigh were groundless and made in bad faith. (*Id.*) Having been written up twice before (in May and July), Lisenby, along with Vigil, decided it would be best to terminate El Kassemy for violation of Telvista's policies. (*Id.* at ¶ 32 and Exhibit 14 attached to Lisenby's Affidavit.)

Telvista's Human Resources Department at the Danville Call Center has no knowledge of El Kassemy complaining, including on or about February 5, 2006, that "confidential medical information" had allegedly been disclosed to El Kassemy's husband as she states in her charge of discrimination to the EEOC. (*Id.* at ¶ 33.) In fact, employee medical and benefit information is not kept at the Danville Call Center. (*Id.*) Rather, such information is stored at Telvista's facilities in Dallas, Texas. (*Id.*)

Telvista also did not take any action as to El Kassemy because she was allegedly discussing her complaint and communications with the EEOC as she states in her charge. (*Id.* at ¶ 34.) Telvista did not care if El Kassemy filed complaints with the EEOC or talked to the EEOC. (*Id.*)

Finally, at no time during El Kassemy's employment, did El Kassemy state to Lisenby or the Danville Call Center's Human Resources Department that she felt that she was being "harassed" as to the above or any other issues specifically because she was Black or because of her age. (*Id.* at ¶ 35.) To the best of Telvista's knowledge, El Kassemy also never claimed that there were any derogatory comments or slurs made to her regarding her race or age. (*Id.*) Stated

simply, El Kassemy's age, race, or the fact that she had made a complaint about the release of confidential medical information played no role in the decision to terminate El Kassemy.  (*Id.* at ¶ 36.)

### ARGUMENTS AND AUTHORITIES

I.   **SUMMARY JUDGMENT SHOULD BE GRANTED TO TELVISTA BECAUSE EL KASSEMY CANNOT LEGALLY SHOW THAT SHE WAS HARASSED OR DISCRIMINATED AGAINST BECAUSE OF HER RACE OR AGE, OR THAT SHE WAS TERMINATED IN RETALIATION FOR THE ALLEGED DISCLOSURE OF HER CONFIDENTIAL MEDICAL INFORMATION TO HER HUSBAND.**

**A.**    **THE STANDARD FOR GRANTING SUMMARY JUDGMENT.**

Fed. R. Civ. P. 56(c) provides that summary judgment is appropriate if the pleadings and supporting materials show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.  *See* Fed. R. Civ. P. 56(c).  The "mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-248 (1986) (emphasis added).  In other words, "[w]here the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial,'" and summary judgment is appropriate.  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (citations omitted).

Once the moving party has demonstrated the absence of any genuine issues of fact, the opposing party is required to come forward with specific facts showing that there are genuine issues of material fact.  *See, e.g., Anderson*, 477 U.S. at 256-257; *Matsushita*, 475 U.S. at 586-587.  To satisfy this burden, the non-moving party may not rest upon "some metaphysical doubt

WOODS ROGERS PLC
ATTORNEYS AT LAW

as to the material facts" or upon "mere allegations or denials." *Matsushita*, 475 U.S. at 586. Speculative assertions concerning the defendant's "state of mind" or "motivation" also will not suffice. *Goldberg v. B. Green and Co., Inc.*, 836 F. 2d 845, 848 (4th Cir. 1988); *Felty v. Graves Humphries Co.*, 818 F. 2d 1126, 1128 (4th Cir. 1987). Instead, the court should "scrutinize the plaintiff's case to determine whether the plaintiff has proffered sufficient proof, in the form of *admissible* evidence, that could carry the burden of proof of his claim at trial." *Mitchell v. Data General Corp.*, 12 F.3d 1310, 1316 (4th Cir. 1993)(emphasis added).

A district court has an "affirmative obligation" to prevent factually unsupported claims from proceeding to trial. *Felty*, 818 F.2d at 1128 (*quoting Celotex Corp. v. Catrett*, 477 U.S. 317, 323-324 (1986)). That is because the "[s]ummary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed 'to secure the just, speedy and inexpensive determination of every action.'" *Celotex*, 477 U.S. at 327.

### B.     EL KASSEMY CANNOT PROVE THAT SHE WAS THE SUBJECT OF RACIAL OR AGE BASED HARASSMENT.

#### 1.     General.

To establish a *prima facie* case of harassment/hostile work environment based on race or age, a plaintiff must prove the following four elements: (1) there was unwelcome harassment; (2) the harassment was based on either race or age; (3) the harassment was so severe or so pervasive that it altered the conditions of employment and created an abusive atmosphere; and (4) there is some basis for imposing liability on the employer. *See e.g.*, *Bass v. E.I. Dupont de Nemours & Co.*, 324 F.3d 761, 765 (4th Cir. 2003), *cert. denied*, 540 U.S. 940 (2003); *Shuler v. Corning*,

*Inc.*, 2008 WL 3929139 (W.D. Va. 2008) (Kiser).[3]  As the Supreme Court has repeatedly noted,

however, not every workplace slight or disagreement rises to the level of actionable harassment.

Rather, the "standards for judging hostility are sufficiently demanding to ensure that Title VII [or

the ADEA] does not become a 'general civility code.'  Properly applied, they will filter out

complaints attacking 'the ordinary tribulations of the workplace, such as the sporadic use of

abusive language, [racial or age]-related jokes, and occasional teasing.'"  *Faragher v. City of

Boca Raton*, 524 U.S. 775, 788 (1998).  The "conduct must be *extreme* to amount to a change in

the terms and conditions of employment . . . ."  *Id.* (emphasis added.)

> ### 2.  El Kassemy cannot establish the second element of the *prima facie* case for a hostile work environment because there is no evidence that the complained of conduct was based on El Kassemy's race or age.

Neither in El Kassemy's Complaint or her EEOC charge is there any evidence which

establishes that the complained of harassing conduct was "because of" El Kassemy's race or age.

(*See* Docket # 3 and Exhibit A to the Appendix attached hereto.)  For instance, there is no

allegation (or evidence for that matter) to suggest that any employee at Telvista ever used racial

or age based epithets or slurs against El Kassemy.  (*Id.*; *see also* Lisenby Aff. at ¶ 35.)  This is

normally the type of evidence that could tend to show that the harassing conduct was based on

age or race.  Moreover, while El Kassemy may have felt mistreated, she never specifically made

the claim that the mistreatment was because of her race or age in any of the complaints she made

to Telvista.  (Lisenby Aff. at ¶ 35.)  Consequently, while El Kassemy may be Black and over the

age of 40, there is nothing to suggest that she was the subject of alleged mistreatment *because

she* was Black or over 40.  This precludes any hostile environment claim that El Kassemy may

WOODS ROGERS PLC
ATTORNEYS AT LAW

---

[3]  Hostile work environment claims based on race or age are generally reviewed under the same standard as those based on sexual harassment. *See National Railroad Passenger Corp. v. Morgan*, 536 U.S. 101, 116 n. 10 (2002).

have. *Hawkins v. PepsiCo, Inc.*, 203 F.3d 274 (4th Cir. 2000), *cert. denied*, 531 U.S. 875 (2000) is illustrative on this point.

In *Hawkins*, a Black plaintiff had a problem with her White supervisor. Hawkins claimed, among other things, that she "received inadequate coaching, had to do work over and over, was unreasonably required to work late the night of an office Christmas party, and did not have access to the same work opportunities as other managers." 203 F.3d at 281. Allegedly, Hawkins' supervisor also "often criticized or laughed at [her,] . . .rarely praised [her] in public[,] . . . failed to acknowledge [her] input[, and] . . .criticized her for not being a 'team player.'" 203 F.3d at 277.

Notwithstanding these allegations, the Court held that Hawkins could not proceed with her claim for racial harassment because she could not show that her supervisor's alleged animus was based on race. The Court noted, in words that resound to this case, that it would not assume that such an animus existed simply because of the different races of Hawkins and her supervisor:

> Hawkins, however, has shown nothing more than a routine difference of opinion and personality conflict with her supervisor. Because we refuse to transmute such ordinary workplace disagreements between individuals of different races into actionable race discrimination, we affirm the judgment of the district court dismissing Hawkins' claims.

> \*      \*      \*

> Indeed, [Hawkins'] complaints about [her supervisor's] management style toward her are without a hint of racial significance. Even if [her supervisor] harboured some personal dislike of Hawkins that made Hawkins' job more difficult or stressful, '[a]n employer is not required to like his employees.' *Cerberonics*, 871 F.2d at 457 (internal quotation marks omitted). And it is for PepsiCo, not the courts, to rule on the wisdom and generosity of [her supervisors] management practices.

> \*      \*      \*

> These sorts of disagreements and misunderstandings are ordinary occurrences in a workplace setting. We decline to impute a racial

WOODS ROGERS PLC
ATTORNEYS AT LAW

13

character to them based simply on Hawkins' conjecture.

203 F.3d at 276, 281; *see also Cooper v. Flying J Travel Plaza, Inc.*, 2007 WL 4211027, at *10

(D. S.C. 2007) (no harassment where, as here, alleged harasser did not make racial comments or

did not refer to plaintiff's race in any way).[4]

      While the *Hawkins* case dealt with a hostile work environment based on race, El

Kassemy's allegations regarding a hostile work environment based on age similarly fail. For

example, in *Bass v. E.I. Dupont de Nemours & Co.*, 324 F.3d 761, 765 (4th Cir. 2003), *cert.*

*denied*, 540 U.S. 940 (2003), the plaintiff, who was over 40, had her duties reassigned because of

performance issues. After the re-assignment, she made several complaints of harassment/hostile

work environment. As is the case here, the plaintiff never claimed, to those who were

investigating her claim, that the alleged harassment was based on her age.[5]  324 F.3d at 763

("The team spoke with Bass and discussed her complaints. Bass reiterated her complaints about a

hostile work environment, but did not allege that the environment was hostile due to her gender,

race, or age"). In granting summary judgement to the employer, the Court noted:

> We think that Bass has failed to allege facts sufficient to support
> at least the second and third elements of her hostile work environment
> claim. Even when viewed in the light most favourable to Bass, the facts she
> alleges merely tell a story of a workplace dispute regarding her
> reassignment and some perhaps callous behavior by her superiors. They
> do not describe the type of severe or pervasive gender, race, or age based
> activity necessary to state a hostile work environment claim. Bass was

---

    [4] In *Hawkins*, the plaintiff's alleged harasser was White. Here, El Kassemy's main alleged
antagonist (Leigh) was Black like El Kassemy. (Lisenby Aff. at ¶ 8.) Additionally, approximately 70% of
Telvista's workforce during the relevant time period was comprised of Blacks. (*Id.* at ¶ 6.) Under these
facts, it would be particularly troublesome to give credence to El Kassemy's unsubstantiated assertion
that Telvista somehow condoned or was guilty of a hostile work environment based on race. *Cf. Jiminez
v. Mary Washington College*, 57 F.3d 369, 378 (4th Cir.), *cert. denied*, 116 S.Ct. 380 (1995) (Title VII
case holding that employers who hire employees from a protected class are generally unlikely to
discriminate against those from that protected class).

    [5] *See* Lisenby Aff. at ¶ 35.

WOODS ROGERS PLC
ATTORNEYS AT LAW

required to plead facts in support of her claim, and she had failed in
that regard.

324 F.3d 763.[6]

Stated simply, there is no evidence in this case that the alleged "harassment" El Kassemy

was subjected to was because she was Black and/or because she was over 40.  She never made

such an allegation while she was employed, and as *Hawkins* and *Bass* instruct, she is legally

precluded from making such an assertion after the fact.

> **3.     El Kassemy cannot establish the third element of the *prima facie* case for a
> hostile work environment because the conduct alleged by El Kassemy is not
> so severe or pervasive enough, as a matter of law, to create a hostile work
> environment.**

Assuming for the sake of argument only that the conduct alleged by El Kassemy was

somehow based on her race or age, summary judgment is still proper because the alleged conduct

is far from what courts require to constitute actionable harassment.  That is to say, in determining

if the third element of the *prima facie* case has been established, several factors are considered.

They are: the frequency and severity of the harassment, whether it was physically threatening or

humiliating, whether it reasonably interfered with work performance, and whether it resulted in

physical harm.  *See, e.g., Harris v. Forklift Sys.*, Inc., 510 U.S. 17, 21 (1993).

---

[6] El Kassemy was 40 at the time of her hire and she was only employed for a little more than a
year. (*See* Exhibit A to the Appendix attached hereto.)  Additionally, Lisenby was 59 years old during
much of El Kassemy's employment. (Lisenby Aff. at ¶ 1.)  It is illogical to believe that Telvista would
have hired El Kassemy when she was over 40 and protected by the ADEA only for the purpose of
harassing her (or allowing her to be harassed) because of her age.  *Cf., Birkbeck v. Marvel Lighting Corp.*,
30 F.3d 507, 513 (4th Cir. 1994), *cert. denied*, 513 U.S. 1058 (1994) (age case stating "employers who
knowingly hire workers within a protected group seldom will be credible targets for charges of pretextual
firing"); *Proud v. Stone*, 945 F.2d 796, 797 (4th Cir. 1991) (under the ADEA "[i]t hardly makes sense to
hire workers from a group one dislikes (thereby incurring the psychological costs of associating with
them), only to fire them once they are on the job").

Additionally, the determination as to whether a hostile work environment existed is not made form the plaintiff's subjective view alone.  Rather, a plaintiff must establish that the environment was "both objectively and subjectively offensive, one that a reasonable person would find hostile or abusive, and one that the victim in fact did perceive to be so." *Faragher v. City of Boca Raton*, 524 U.S. 775, 787 (1998).

Finally, a hostile work environment only exists when the workplace is "permeated with discriminatory intimidation, ridicule, and insult." *Forklift Sys.*, 510 U.S. at 21.  Thus, as this very Court has held, "simple teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount to" actionable harassment.  *Shuler v. Corning*, 2008 WL 3929139 (W.D. Va. 2008).

Before discussing whether the conduct alleged by El Kassemy was so severe or pervasive enough, as a matter of law, to create a hostile work environment under the standards set forth above, it should not be forgotten that Telvista investigated every allegation made by El Kassemy as to her alleged harassment.  (*See generally* Lisenby Aff.)   None of the allegations could be substantiated.  (*Id.*)  For some of those allegations— such as Leigh allegedly starting rumours about having an affair with El Kassemy's husband—El Kassemy either refused to cooperate with Telvista's investigation by refusing to, or not being able to, produce e-mail and phone records which would substantiate her claim, or Telvista could not find any corroborative witnesses. (Lisenby Aff. at ¶¶ 8-18, 27-31.) [7]   Thus, as to these claims, it is only El Kassemy's conclusory allegations, without any evidence to support the allegations, that she was being "harassed."

---

WOODS ROGERS PLC
ATTORNEYS AT LAW

[7] The same is true as to El Kassemy's claim that Telvista somehow allowed her confidential medical information to be disclosed to her husband.  Telvista has no record of such a complaint being filed while El Kassemy was employed, and even if she had filed such a complaint, it would have been almost impossible for this to occur since medical and benefit information is kept off the Danville Call Center's premises.  (Lisenby Aff. at ¶ 33.)

16

For other assertions, like her claim that she was under heavy surveillance, there was documented evidence that this was not the case and that all employees were monitored, including many who were monitored more than El Kassemy. (*Id.* at ¶¶ 19-24.)  And still for other allegations, like El Kassemy not getting the time-off she requested, there was no evidence that there was any tampering or untoward conduct. (*Id.* at ¶¶ 25-26)  Rather, El Kassemy did not get time-off because of legitimate non-discriminatory reasons—she didn't follow procedure, there was no time-off to take, etc. (*Id.*)

All of the above, in and of itself, warrants the dismissal of El Kassemy's harassment claim because there can be no harassment when an employee, form an objective perspective, is treated the same as anyone else and is subject to the same rules as anyone else. *See, e.g., Carter v. Ball*, 33 F.3d 450, 460-62 (4th Cir. 1994).  The fact that El Kassemy, from a purely subjective perspective, may not have liked the way she was treated is simply of no moment. *Faragher v. City of Boca Raton*, 524 U.S. 775, 787 (1998).  Thus, El Kassemy's "conclusory statements" that she was being harassed, "without specific evidentiary support, cannot support an actionable claim for harassment." *Causey v. Balog*, 162 F.3d 795, 802 (4th Cir. 1998).

What is certain, however, is that even if El Kassemy's allegations are viewed to be true—*e.g.*, that Leigh had spread rumours about having an affair with El Kassemy's husband, she was being monitored excessively, she was denied time-off, and her confidential medical information was disclosed—this is not enough, as a matter of law, to survive summary judgment because these incidents are not so severe or pervasive enough to create a hostile work environment.  In fact, courts have routinely rejected allegations of harassment far more egregious than that alleged by El Kassemy.

WOODS ROGERS PLC
ATTORNEYS AT LAW

17

For example, in *Martin v. Merck & Co.*, 446 F.Supp.2d 615, 627-630 (W.D. Va. 2006), this Court found that there was no racially based hostile work environment, as a matter of law, even where there were up to sixteen incidents of inappropriate behaviour and comments over a period of several years. These incidents included, among others: the use of the word "nigger" by several people; an employee telling another that there never would be a black female supervisor; an employee telling another that blacks were not good at operating machinery; a racially offensive cartoon being placed on another employee's door; an Energizer Bunny toy being defaced to read "nigger"; an employee taunting another employee with a noose; an employee telling another that he needed to go back to the jungle and further mocking him because he was Black; employees taunting another in the locker room saying that she had an unpleasant odor because she was a black woman and also making fun of her hair, weight, and appearance; and employees auctioning and showing Klu Klux Klan material on the internet.

Similarly, in *Gustave-Schmidt v. Chao*, 360 F.Supp.2d 105, 121 (D.D.C.2004), *aff'd.*, 2004 WL 2348142 (D.C. Cir. 2004), the Court held that there was no age or race based hostile work environment, as a matter of law, where plaintiff, among other things, alleged that: "(1) she was falsely accused of forgery and subjected to an investigation and possible suspension; (2) she was closely monitored and followed by a co-worker; (3) she was yelled at by her Supervisor . . . in close proximity to her fellow co-workers; and (4) her Supervisor 'used ethnic slurs such as 'spic,' when speaking about Hispanics to [her] ... [and] also told her that 'older females should not be in the field of economics,' and 'that older women didn't make it as managers.'" The court there specifically noted that the incidents, while offensive, were not, in total, severe or pervasive enough, from an objective standpoint, to create an abusive environment. *Id.*; *see also Li Li Manatt v. Bank of America*, 339 F.3d 792, 795, 798-99 (9th Cir. 2003) (no claim where plaintiff

WOODS ROGERS PLC
ATTORNEYS AT LAW

18

was referred to as "China woman" and told to get her "butt over here", and co-workers would "pull[ ] their eyes back with their fingers in an attempt to imitate or mock the appearance of Asians"); *Shuler v. Corning*, 2008 WL 3929139 (W.D. Va. 2008) (motion to dismiss granted where plaintiff believed he was harassed when supervisor made comments regarding then candidate Barack Obama and race); *E.E.O.C. v. E&H Elec. Service, Inc.*, 2007 WL 841942 (W.D. N.C. 2007) (no hostile work environment where Native-American called "chief", "redskin", "spearchucker", "halfbreed"); *Greene v. Swain County Partnership for Health*, 342 F.Supp.2d 442, 454-55 (W.D. N.C. 2004) (no harassment where, among other things, Native American was called "Token Indian," had derogatory comments made about her black hair and high cheekbones); *Smith v. Beverly Health and Rehab. Servs., Inc.*, 978 F.Supp. 1116 (N.D.Ga.1997) (no claim where, among other things, comments were made such as "these goddamn Georgia niggers think they own Georgia," and "where I come from niggers knew their place" ).

Interestingly, in most of the cases cited above, the allegations included the use of derogatory racial or age based statements and sentiments.  These type of slurs, if they are not isolated, can lead to a finding of a hostile work environment.  *See Shields v. FedEx Corp.*, 120 Fed App'x 956, 961 (4th Cir.2005).  Here, however, there is no evidence whatsoever that El Kassemy was ever subject to any such boorish behaviour, thus severely eviscerating any cause of action she may have.  *See Cooper v. Flying J Travel Plaza, Inc.*, 2007 WL 4211027, at *10 (D. S.C. 2007) (no harassment where, as here, alleged harassers did not make racial or age based comments).[8]

WOODS ROGERS PLC
ATTORNEYS AT LAW

---

[8] *See* Docket # 3 and Exhibit A to the Appendix attached hereto; *see also* Lisenby Aff. at ¶ 35.

Additionally, among the circumstances examined to determine if there was a hostile work environment are "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Harris v. Forklift Sys.*, Inc., 510 U.S. 17, 21 (1993).  None of those factors are present here as well.

For example, nothing in El Kassemy's charge or Complaint suggests that the alleged harassing conduct was frequent.  (*See* Docket # 3 and Exhibit A to the Appendix attached hereto.)  Rather, all that occurred was that El Kassemy continued to complain *about the same* conduct repeatedly because she apparently did not like Telvista's conclusion that her allegations could not be substantiated. (*See generally* Lisenby Aff.)  There is also no allegation in the Complaint or charge that El Kassemy was physically threatened or humiliated because of the alleged conduct.  (*See* Docket # 3 and Exhibit A to the Appendix attached hereto.)  El Kassemy may have been angry about the alleged conduct or may have disliked it, but that does not make the conduct actionable.  *See Hopkins v. Baltimore Gas and Elec. Co.*, 77 F.3d 745, 753-754 (4th Cir. 1996), *cert. denied*, 519 U.S. 818 (1996) (although conduct was "undoubtedly tasteless and inappropriately forward" it was not "of the type" that would create a hostile work environment). Finally, neither the charge or El Kassemy's Complaint suggests her work performance was interfered with as a result of the alleged conduct.  (*See* Docket # 3 and Exhibit A to the Appendix attached hereto.)  In fact, by all accounts El Kassemy continued to work without loss of pay, benefits, or other tangible employment consequences until her later discharge for other

reasons.  (*Id.*)[9]

Stated simply, in today's society, many employees believe that any workplace slight or

comment is "harassment."  While that maybe the case in the colloquial sense it is not so legally

under Title VII or the ADEA as these statutes do not attempt "to purge the workplace of

vulgarity." *Hopkins*, 77 F.3d at 753.  Here, El Kassemy may have a sincere belief that she was

"harassed" at work.  But her subjective belief, and her frequent and loose use of the word

"harassment", is not enough for her to survive summary judgment.

>    **4.     El Kassemy cannot establish the fourth element of the *prima facie* case for a
>            hostile work environment because there is no basis for imposing liability on
>            Telvista.**

In order for Telvista to be held liable for the alleged harassing conduct of its employees,

there has to be some basis for imputing liability to it. *See e.g., Bass v. E.I. Dupont de Nemours*

*& Co.*, 324 F.3d 761, 765 (4th Cir. 2003), *cert. denied*, 540 U.S. 940 (2003).  The standard for

imputing liability is as follows:

>    An employer is subject to vicarious liability to a victimized employee
>    for an actionable hostile environment created by a supervisor with
>    immediate (or successively higher) authority over the employee. When no
>    tangible employment action is taken, a defending employer may raise an
>    affirmative defense to liability or damages, subject to proof by a
>    preponderance of the evidence, see Fed. Rule Civ. Proc. 8(c). The defense
>    comprises two necessary elements: (a) that the employer exercised
>    reasonable care to prevent and correct promptly any sexually harassing
>    behavior, and (b) that the plaintiff employee unreasonably failed to take
>    advantage of any preventive or corrective opportunities provided by the
>    employer or to avoid harm otherwise. While proof that an employer had
>    promulgated an antiharassment policy with complaint procedure is not
>    necessary in every instance as a matter of law, the need for a stated
>    policy suitable to the employment circumstances may appropriately be
>    addressed in any case when litigating the first element of the defense.

WOODS ROGERS PLC
ATTORNEYS AT LAW

_____

[9] *See Mack v. Strauss*, 134 F.Supp.2d 103, 114 (D.D.C.2001), *aff'd*, 2001 WL 1286263 (D.C. Cir.
2001) ("the fact that plaintiff believes [s]he was isolated [for investigation or charges of wrongdoing]
does not constitute a materially adverse consequence or disadvantage in the terms and conditions of h[er]
employment so as to establish an adverse personnel action").

> And while proof that an employee failed to fulfill the corresponding
> obligation of reasonable care to avoid harm is not limited to showing
> any unreasonable failure to use any complaint procedure provided by
> the employer, a demonstration of such failure will normally suffice to
> satisfy the employer's burden under the second element of the defense.
> No affirmative defense is available, however, when the supervisor's
> harassment culminates in a tangible employment action, such as
> discharge, demotion, or undesirable reassignment.

*Burlington Industries, Inc. v. Ellerth*, 524 U.S. 742, 765 (1998).[10]

Here, there is nothing in the charge or Complaint to suggest that the alleged harassing conduct El Kassemy complains about caused El Kasssemy to suffer "a significant change in employment status." (*See* Docket # 3 and Exhibit A to the Appendix attached hereto.)[11] Consequently, Telvista can escape liability by showing: "(a) that [it] exercised reasonable care to prevent and correct promptly any . . . harassing behavior, and (b) that the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by [Telvista] or to avoid harm otherwise." *Burlington Industries,*, 524 U.S. at 765.

Here, Telvista can easily satisfy both prongs. First, Telvista had a policy which prohibits harassment and discrimination. (Lisenby Aff. at ¶ 4.) El Kassemy certainly knew about the policy as she utilized it several times. (*Id.* at ¶¶ 4-5.) In every instance that it had knowledge of an allegation, Telvista investigated the allegation. (*See generally* Lisenby Aff.) This satisfies the first element. *Burlington Industries,*, 524 U.S. at 765 ("[w]hile proof that an employer had promulgated an antiharassment policy with complaint procedure is not necessary in every

---

[10] According to El Kassemy, most of the alleged harassment was done by Leigh who was not El Kassemy's supervisor. (*See generally* Lisenby Aff.) However, because El Kassemy alleges that some forms of harassment were allegedly perpetrated by management—*e.g.*, excessive surveillance—the standard for supervisor liability as discussed in *Burlington, supra*, applies.

[11] The only change in employment status was El Kassemy's termination. (*See* Docket # 3 and Exhibit A to the Appendix attached hereto.) The termination, however, occurred not because of the alleged harassment El Kassemy was subjected to by a supervisor, but because El Kassemy was found to have acted inappropriately with another employee. (Lisenby Aff. at ¶¶ 27-32.)

22

WOODS ROGERS PLC
ATTORNEYS AT LAW

instance as a matter of law, the need for a stated policy suitable to the employment circumstances may appropriately be addressed in any case when litigating the first element of the defense").

As to the second element, the evidence shows that El Kassemy failed to cooperate with Telvista's investigation of her complaints. For example, when asked to provide evidence of harassing e-mail and phone calls sent or made by Leigh she refused to do so. (Lisenby Aff. at ¶¶ 10, 30.) She also failed to complain about the alleged disclosure of confidential medical information to her husband. (*Id.* at ¶ 33.) This satisfies the second prong of the test to escape liability. *Burlington Industries,*, 524 U.S. at 765 ("[a]nd while proof that an employee failed to fulfill the corresponding obligation of reasonable care to avoid harm is not limited to showing any unreasonable failure to use any complaint procedure provided by the employer, a demonstration of such failure will normally suffice to satisfy the employer's burden under the second element of the defense"); *see also Harper v. City of Jackson Municipal School Dist.*, 149 Fed.Appx. 295, at **6 (5th Cir. 2005) (failure to report or cooperate in an investigation bars a claim for harassment). Summary judgment for Telvista is thus proper.

## C. EL KASSEMY CANNOT SHOW THAT SHE WAS DISCHARGED IN RETALIATION FOR ANY COMPLAINT SHE MADE.

El Kassemy's charge, which defines the scope of this litigation,[12] asserts that she was discharged on or about August 20, 2006 in retaliation *only* for a complaint she made to Telvista on or about February 5, 2006 regarding an alleged inappropriate disclosure of her confidential medical information to her husband. (*See* Exhibit A attached to the Appendix hereto.) This,

WOODS ROGERS PLC
ATTORNEYS AT LAW

---

[12] *Evans v. Technologies Applications and Serv. Co.*, 80 F.3d 954, 962-63 (4th Cir. 1996).

23

according to El Kassemy, was in violation of Section 503 of the ADA. (*Id.*)[13]  Prior to discussing the factual merits of this claim, Telvista would point out that such an allegation is legally misplaced, and as a result, the portion of her Complaint dealing with retaliation should be dismissed.

First, Telvista is unaware of a "Section 503" under the ADA. The only Section 503 that applies to disabled individuals is Section 503 of the Rehabilitation Act of 1973, which in an nutshell prohibits discrimination and requires employers with federal contracts or subcontracts that exceed $10,000 to take affirmative action to hire, retain, and promote qualified individuals with disabilities. Telvista, however, is a private employer and not a government contractor. (Lisenby Aff. at ¶ 3.) Telvista does not have contracts in excess of $10,000 entered into with the federal government for Section 503 of the Rehabilitation Act to apply. (*Id.*) Consequently, because no rights exist or is conferred under Section 503 of the ADA, and because Section 503 of the Rehabilitation Act is not applicable to Telvista, summary judgment is proper for Telvista as to the retaliation claim.

Second, Telvista would point out that it has no knowledge of a complaint being raised by El Kassemy, at any time during her employment, that confidential medical information was released to her husband. (Lisenby Aff. at ¶ 33.)[14]  As common sense dictates, this lack of

---

[13] Indeed, while El Kassemy's charge claims that there was disability discrimination— based on the box for disability discrimination being checked—the only time El Kassemy mentions the ADA in the particulars of the charge is with regard to the retaliatory discharge for the alleged breach of confidential information. (*See* Exhibit A to the Appendix attached hereto.) Nowhere in the particulars does it state that El Kassemy had a "physical or mental impairment" that "substantially" limited one or more of her major life activities in order for her to be considered "disabled" and under the protection of the ADA. (*Id.*) *See* 42 U.S.C. § 12102(2)(A).

[14] In fact, the likelihood of this occurring is nearly impossible since medical and benefit information is not kept at Telvista's Danville Call Center. (Lisenby Aff. at ¶ 33.)

WOODS ROGERS PLC
ATTORNEYS AT LAW

knowledge bars any claim of retaliation. *Dowe v. Total Action Against Poverty in Roanoke Valley*, 145 F.3d 653, 657 (4th Cir.1998) ( "[s]ince, by definition, an employer cannot take action because of a factor of which it is unaware, the employer's knowledge that the plaintiff engaged in a protected activity is absolutely necessary" in order to establish a claim of retaliatory discharge).

Notwithstanding the above, even if one assumes for the sake of argument that: (a) Telvista improperly disclosed El Kassemy's confidential medical information to her husband, (b) that El Kassemy complained about this and Telvista knew of the complaint, and (c) that the disclosure of such information was somehow protected under the ADA, the Rehabilitation Act, or some other statute, El Kassemy still would not be able to prove retaliation. That is because, "the test for proving *prima facie* retaliatory discharge requires that (1) plaintiff engaged in protected activity, such as filing an EEO complaint; (2) the employer took adverse employment action against plaintiff; and (3) a causal connection existed between the protected activity and the adverse action." *Causey v. Balog*, 162 F.3d 795, 803 (4th Cir. 1998) (*quoting Carter v. Ball*, 33 F.3d 450, 460 (4th Cir. 1994)).[15] Here, El Kassemy cannot show that a causal connection existed.

While there are cases that accept mere temporal proximity between an employer's knowledge of protected activity and the adverse employment action to be sufficient evidence of a causal connection to establish a *prima facie* case, the "temporal proximity must be very close" for this to occur. *See Clark County Sch. Dist. v. Breeden*, 532 U.S. 268, 273-74 (2001). A six month span between the protected activity and the adverse action—*i.e.*, the complaint about the alleged disclosure of information in February, 2006 and the subsequent termination in August,

---

WOODS ROGERS PLC
ATTORNEYS AT LAW

[15] Assuming that a *prima facie* case is established, the burden then shifts to Telvista "to rebut the presumption of retaliation by articulating a legitimate nonretaliatory reason for its actions." *Holland v. Washington Homes, Inc.*, 487 F.3d 208, 218 (4th Cir. 2007), *cert. denied.*, 128 S.Ct. 955 (2008). If that is done, then "the burden shifts back to [El Kassemy] to show that the reason is 'mere pretext for retaliation by proving both that the reason was false, and that discrimination was the real reason for the challenged conduct.'" *Id.*

2006— is nowhere near close enough. *See, e.g., Shields v. Fed. Express Corp.*, 120 Fed.Appx. 956, 963 (4th Cir. 2005) (three or four months between the protected activity and the adverse employment action is not enough). As a result, El Kassemy must show that she was fired "because of" the protected activity—the complaint about the dissemination of medical information.

Here, the evidence is un-controverted that Telvista terminated El Kassemy because another employee, Leigh, complained about two e-mails that she received from El Kassemy which Leigh thought were threatening. (Lisenby Aff. at ¶¶ 27-32.) When Telvista confronted El Kassemy about these e-mails, El Kassemy refused to (or could not) provide evidence to support her claim in the original e-mails to Leigh that Leigh had called El Kassemy's home/cell phone or had sent e-mails to El Kassemy's home. (*Id.*) Without this evidence, Telvista believed that El Kassemy was either being uncooperative or that she had made bad-faith allegations against Leigh. (*Id.*) Either of these were violations of Telvista's policies which Telvista believed warranted El Kassemy's discharge. (*Id.*) Because this was an independent reason for termination, no claim for retaliation can exist. *See, e.g., Holland*, 487 F.3d at 218 (no retaliatory discharge where employee was terminated because his employer believed that he threatened another employee); *Carter v. Ball*, 33 F.3d 450, 460 (4th 1994) ("mere knowledge on the part of an employer that an employee has filed a [complaint] is not sufficient evidence of retaliation" where the adverse action taken was based on, among other things, plaintiff's violation of policies); *Cooper v. Flying J Travel Plaza, Inc.*, 2007 WL 4211027, at *11 (D. S.C. 2007) (no retaliation where employee was fired for violating his employer's harassment policy).[16]

WOODS ROGERS PLC
ATTORNEYS AT LAW

---

[16] The same would hold true regarding *any* complaint of harassment that El Kassemy may have made during her employment—*e.g.*, excessive monitoring, etc.

26

Stated another way, the fact that El Kassemy may have complained about the disclosure of confidential information in February, 2006 did not mean that she was immune to discipline or discharge down the road for her violation of company policies.  To hold otherwise would mean that "an employee could guarantee his job security simply by filing a frivolous complaint . . .on his first day of work." *Dowe*, 145 F.3d at 657.  Discrimination statutes such as Title VII and the ADEA were "not enacted to guarantee [such] tenure in the workplace." *Id.*[17]

It should also be noted that it is of no moment if El Kassemy did not think that her e-mails to Leigh were threatening, or that she believed that she did not have to cooperate with Telvista's investigation as to Leigh's complaint.  That is because "[i]t is the perception of the decision maker which is relevant, not the self-assessment of the plaintiff." *See Evans v. Technologies Applications & Serv. Co.*, 80 F.3d 954, 960-61 (4th Cir. 1996).  Moreover, in regards to a claim of discrimination "it does not matter if an employer's decision, in hindsight, was judged to be unwise, improper, or even incorrect as long as the employer believed" that there was a violation of policy. *See Hawkins v. Pepsico, Inc.*, 203 F.3d 274, 279 (4th Cir.), *cert. denied*, 531 U.S. 875 (2000); *Holland*, 487 F.3d at 218.  Stated simply, "[t]he crucial issue in a [discrimination case] is an unlawfully discriminatory motive for a defendant's conduct, not the

---

[17] Even if El Kassemy has made a *prima facie* case, Telvista has rebutted the presumption of retaliation by articulating a legitimate non-retaliatory reason for its actions—the firing of El Kassemy for violation of policy.  At this point, the burden would shift back to El Kassemy to show that the reason proffered is "mere pretext for retaliation by proving both that the reason was false, and that discrimination was the real reason for the challenged conduct." *Holland* 487 F.3d at 218.  In other words:

The ultimate question is whether the employer intentionally discriminated, and proof that the employer's proffered reason is unpersuasive, or even obviously contrived, does not necessarily establish that [Plaintiff's] proffered reason . . . is correct.  It is not enough to disbelieve the defendants here; the fact-finder must believe [Plaintiff's] explanation of intentional race discrimination.

*Love-Lane v. Martin*, 355 F.3d 766, 788 (4th Cir. 2004), *cert. denied*, 543 U.S. 813 (2004).  There is nothing in the record, including in the charge or Complaint, to suggest that El Kassemy could meet this burden. (*See* Docket # 3 and Exhibit A to the Appendix attached hereto.)

WOODS ROGERS PLC
ATTORNEYS AT LAW

27

wisdom or folly of its business judgment", and as such, courts should not sit as a "super-personnel department that reexamines an entity's business decisions." *Beall v. Abbott Labs.*, 130 F.3d 614, 620 (4th Cir. 1997).

## CONCLUSION

As the party opposing summary judgment, El Kassemy is entitled to have the facts and "any permissible inference from the underlying facts" viewed in the light most favorable to her. *Thompson Everett, Inc. v. Nat'l Cable Adver.*, L.P., 57 F.3d 1317, 1323 (4th Cir. 1995).  The facts, however, must have some basis in reality, and the inferences "in every case, [must] fall within the range of reasonable probability and not be so tenuous as to amount to speculation or conjecture." *Id.*  Here, El Kassemy's claims of harassment and retaliation are pure speculation and conjecture.

For the reasons set forth in its Motion for Summary Judgment and the foregoing Memorandum in Support of its Motion for Summary Judgment, Defendant, Telvista, Inc. respectfully requests that its Motion for Summary Judgment be granted, the Complaint be dismissed with prejudice, and that Defendant be granted such other relief as is just and equitable.

Respectfully Submitted

TELVISTA, INC.

/s/ Agnis C. Chakravorty

AGNIS C. CHAKRAVORTY
Virginia State Bar No. 30225
R. J. LACKEY
Virginia State Bar No. 33036

Counsel for Defendant

WOODS ROGERS PLC

28

Wachovia Tower
10 South Jefferson Street
P.O. Box 14125
Roanoke, Virginia 24038-4125
(540) 983-7727 ph.
(540) 983-7711 fax

## CERTIFICATE OF SERVICE

I hereby certify that on January 22, 2009 I electronically filed the foregoing with the

Clerk of the Court using the CM/ECF system and that on January 22, 2009 I over-night mailed

the document to the following non-CM/ECF participant:

Elizabeth Ann El Kassemy
850 Lee Street
Danville, Va. 24541

/s/     Agnis C. Chakravorty
_____

WOODS ROGERS PLC
ATTORNEYS AT LAW